IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LAURA MITCHELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 16 C 146 |
| v. | ) |
| | ) Judge Jorge L. Alonso |
| THE NFL PLAYER ANNUITY PROGRAM | ) |
| and THE NFL PLAYER DISABILITY & | ) |
| NEUROCOGNITIVE BENEFIT PLAN, | ) |
| | ) |
| Defendants. | ) |

**MEMORANDUM OPINION AND ORDER**

Before the Court are plaintiff's amended motion for entry of judgment and defendants' motion to dismiss and for summary judgment.[1] For the reasons explained below, plaintiff's motion is denied and defendants' motion is granted to the extent that this action is dismissed.

**BACKGROUND**

Defendants, the NFL Player Annuity Program ("Annuity Program") and the NFL Player Disability & Neurocognitive Benefit Plan ("Disability Plan") (collectively, the "Plans"), removed this third-party citation action to this court from the Circuit Court of Cook County. This supplementary proceeding arises out of a judgment in a state-court divorce action between Laura Mitchell ("Laura") and Qasim Mitchell ("Qasim"), a former National Football League ("NFL")

---

[1]Plaintiff seeks the entry of judgment, defendants label their motion as one seeking dismissal and summary judgment, and both sides submit matters outside the pleadings. Thus, the Court will treat the parties' motions as arising under Federal Rule of Civil Procedure 56. *See Reber v. Provident Life & Accident Ins. Co.*, 93 F. Supp. 2d 995, 996 n.1 (S.D. Ind. 2000). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In considering such a motion, the court construes the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *See Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014).

player and participant in the Plans. The divorce judgment provides that Laura is entitled to certain monies Qasim was "scheduled to receive" from the NFL "in 2011 or/and 2012", as well as half of Qasim's NFL pension fund and half of "various monies from" Qasim's "401(k) fund." (ECF No. 18-1, J. for Dissolution of Marriage at 5.)[2] The Plans are employee benefits plans subject to the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 *et seq.*[3] Before relating the complicated history of this citation action, the Court first will outline the Plans' relevant policies and procedures for alternate payees, such as ex-spouses, to establish their right to a portion of a plan participant's benefits.

*Plan Provisions*

The Annuity Program provides that, subject to an exception for qualified domestic relations orders ("QDROs"),[4] no benefit under the Program "will be subject in any manner to anticipation, pledge, encumbrance, alienation, levy or assignment, nor to seizure, attachment or other legal process for the debts of any Participant or Beneficiary, unless required by law." (ECF No. 26-4, Ex. 2 to Defs.' Mem. Supp. Mot., NFL Player Annuity Program § 8.1.) The Disability Plan provides

---

[2]The judgment's provision regarding the 401(k) fund may contain an error in that it provides that the "Respondent," who is Qasim, is entitled to one-half of monies from the fund. It is likely inconsequential because the implication is that Laura would be entitled to the other half. But that issue is between the Mitchells and not the parties to this proceeding, so the Court need not delve further.

[3]Defendants removed the action on the ground that Laura's contention that the Plans wrongfully distributed to Qasim benefits to which she was entitled invokes federal jurisdiction under ERISA. (ECF No. 1, Notice of Removal ¶¶ 26-28 (citing, *inter alia*, *Metro. Life Ins. Co. v. Taylor*, 481 U.S. 58, 64-67 (1987) and *Lehmann v. Brown*, 230 F.3d 916, 919 (7th Cir. 2000) ("ERISA occupies much of the field of pension and fringe benefits; the size and distribution of these benefits depends on federal law, so *Metropolitan Life* holds that a claim to benefits necessarily 'arises under' federal law no matter how it is pleaded.")).)

[4]As discussed below, a QDRO is a domestic relations order that meets certain requirements outlined in ERISA. *See* 29 U.S.C. § 1056(d)(3).

2

that, subject to an exception for QDROs and as allowed by 26 U.S.C. § 401(a)(13) (the Internal Revenue Code's non-alienation provision for pension and annuity benefits), no benefit under the Plan "will be subject in any manner to anticipation, pledge, encumbrance, alienation, levy or assignment, nor to seizure, attachment or other legal process for the debts of any Player, unless required by law." (ECF No. 26-5, Ex. 3 to Defs.' Mem. Supp. Mot., NFL Player Disability & Neurocognitive Benefit Plan § 13.5.) The Plans have identical procedures through which individuals who seek to become alternate payees may submit a QDRO.[5] (ECF No. 26-6, Ex. 4 to Defs.' Mem. Supp. Mot., Qualified Domestic Relations Order—Procedures.) Those procedures spell out the requirements for an order to be recognized as a QDRO as well as the requirements for restricting a participant's benefits pending submission of an order and approval by the relevant Board. They also state that a player's "access to plan benefits can be restricted once the Qualified Order Center receives a draft domestic relations order, court order, or joinder." (*Id.* at 4.)

Regarding such restriction on a participant's access to funds, the Plans' internal policies provide that benefits "will only be restricted or suspended if the Q[ualified] O[rder] office receives a draft DRO, signed DRO, Joinder, or restraining order. Benefits will not be restricted or suspended for any other reason including request for models, subpoenas for plan information, or other written communication from an attorney." (ECF No. 26-7, Ex. 5 to Defs.' Mem. Supp. Mot., Qualified Domestic Relations Order Administration Manual at 10.) As for restraining orders, the Plans restrict benefits only upon receipt of orders that "specifically restrain[] (i) a Board or (ii) a Plan from allowing a Player to take a loan, withdrawal, and/or distribution." (*Id.* at 14.)

---

[5]ERISA requires the Annuity Program to "establish reasonable procedures to determine the qualified status of domestic relations orders and to administer distributions under such qualified orders." *See* 29 U.S.C. § 1056(d)(3)(G)(ii).

*The State-Court Proceedings*

Laura and Qasim's divorce judgment was entered in March 2011. Later that year, Laura obtained a QDRO that entitled her to fifty percent of the balance in Qasim's NFL Player Second Career Savings Plan.

In 2014, Laura submitted to the Annuity Program a draft domestic relations order for child support under which she would be an alternate payee to receive a portion of Qasim's Program benefits. Eventually, on February 26, 2015, the Annuity Program preapproved the draft as a QDRO. The notice informing Laura of the preapproval stated that the proposed order would satisfy the requirements of a QDRO based on the Plan's requirements "once the court signs and certifies the order"; the "court signed" order would have to be returned to the NFL Player Benefits Office (the "Benefits Office") and be accepted as a [QDRO] before any benefits would be awarded to Laura; Qasim's "benefit activity" had been restricted upon receipt of the proposed order; and if a certified domestic relations order was not received within ninety days of the notice date, the restrictions on Qasim's benefits would be removed. (ECF No. 26-12, Ex. 10 to Defs.' Mem. Supp. Mot., Domestic Relations Order Preapproval Notice.) After the Benefits Office did not receive a certified copy of the QDRO from Laura, the Annuity Program sent her a warning notice on April 27, 2015, reminding her that if it did not receive a revised domestic relations order in thirty days, the existing restrictions on Qasim's benefits would be lifted, and Qasim would have "unrestricted access to" the Program. (ECF No. 26-13, Ex. 11 to Defs.' Mem. Supp. Mot., Domestic Relations Order Restriction Lift Warning Notice.) On May 1, 2015, a court presiding over the post-dissolution proceedings related to the divorce judgment entered a $306,220.04 judgment against Qasim based on his failure to pay child support as ordered in the divorce judgment.

Thereafter, Laura did not submit a certified domestic relations order to the Annuity Program

4

for approval. On May 12, 2015, however, her divorce attorney, Leslie Fineberg, issued citations to discover assets that noted the $306,220.04 unsatisfied judgment against Qasim and named as respondents the NFL and the NFL Players Association (the "Players Association"), which are separate entities from the Plans. The citations included the following language: "You are PROHIBITED from making or allowing any transfer or other disposition of, or interfering with, any property not exempt from the enforcement of a judgment, a deduction order or garnishment, property belonging to the judgment debtor to which s/he may be entitled . . . , and from paying over or otherwise disposing of any monies not so exempt . . . ." (ECF No. 18-2, Citations to Discover Assets to a Third Party (boldface omitted).) They also stated that this prohibition would remain in effect until further order of court or termination of the proceeding. The citations were not served on the NFL or Players Association; rather, they were mailed to the Benefits Office, which handles the day-to-day operations of the Plans. The Benefits Office received the citations in mid-May.

On May 25, 2015, the Annuity Program sent Laura a notice stating that it had received the citation notice "to extend the restriction on the Player's NFL Player Annuity Program" and that the restriction could continue only if the Qualified Order Team received a new draft domestic relations order that was different from the previously preapproved one, a court order, or a joinder. (ECF No. 26-15, Ex. 13 to Defs.' Mem. Supp. Mot., Domestic Relations Order Information Notice (boldface omitted).) The notice further stated in bold print: "If the Qualified Order Team does not receive one of the above by May 27, 2015, the restriction on the Player's NFL Player Annuity Program will be removed." (*Id.*)

Laura did not submit a new draft order, court order, or joinder to the Annuity Program, so on May 27, 2015, the Program lifted the restriction on Qasim's account. On that date, in response to Qasim's application for disability benefits, the Disability Plan also issued Qasim a disability

5

benefit payment in the amount of $50,000.00.

In a letter to Fineberg dated June 8, 2015, the Plans again stated that to restrict Qasim's benefits, they needed a draft domestic relations order, a court-certified domestic relations order, or a restraining order against a Plan, and that a judgment alone was insufficient. (ECF No. 26-20, Ex. 18 to Defs.' Mem. Supp. Mot., Domestic Relations Order Request for Information.) That letter also answered the citations' three interrogatories concerning the nature of the monies in the respondents' custody. Nevertheless, shortly thereafter, Fineberg appeared in state court and obtained an *ex parte* show-cause order against the NFL and the Players Association, which had not appeared in court. When the NFL and Players Association did not appear for the July 16 show-cause hearing, Fineberg sought entry of judgment against those entities.

Meanwhile, in early June, and apparently because the restriction had been lifted, Qasim had applied for a lump-sum distribution of the entirety of the funds in his non-tax-qualified Annuity Program account. On June 24, 2015, the Annuity Program processed that application and distributed to Qasim from his account a lump sum of $64,379.15. On July 15, Fineberg's law firm submitted a draft QDRO to the Annuity Program. The next day, the Qualified Order Center issued a notice indicating that upon receipt of the draft, it had started the process of restricting Qasim's funds. But on July 17, the Qualified Order Center rejected the draft QDRO because Qasim no longer had any funds in the Annuity Program. In the meantime, on July 1, Qasim had received another disability payment from the Disability Plan, this one in the amount of $10,000.00.

In July and August 2015, further communications ensued between Laura's divorce attorneys and employees of, and counsel for, the Plans, concerning the Plans' status as separate entities from the NFL and Players Association. Fineberg continued to pursue judgment against the NFL in state

court.[6] In early August, counsel for the Annuity Program sent emails to Fineberg stating that the Annuity Program and other benefit plans for NFL players were separate entities from the NFL and Players Association, and it was the Annuity Program, not the NFL and Players Association, that had the documents and information Laura sought. After further communications between counsel for the Annuity Program and Fineberg, the NFL still did not appear in court to respond to the citation, and Fineberg continued to pursue judgment against the NFL.

On September 17, 2015, Fineberg filed a motion for "entry of conditional judgment" against the NFL "and/or the [NFL] Players Benefits Office," arguing that the NFL and the Benefits Office had "willfully failed to comply" with the citation by failing to "freeze" the assets in Qasim's benefits accounts and releasing a total of $124,379.15 to Qasim after the citations had been issued. (ECF No. 1-10, Ex. 9 to Decl. of Michael L. Junk, Mot. for Entry of Conditional J. at 1, 5.) Shortly thereafter, the NFL moved to quash the citations to discover assets, and it also sought sanctions against Fineberg.

On December 7, 2015, the state court dismissed the citation as to the NFL. In January 2016, while the matter of sanctions was still pending, Laura filed a "Motion to Correct Party's Name Based on Misnomer of a Party," seeking to "amend the name on the Citation to Discover Assets to a Third Party from the [NFL] to the National Football League Player Benefits Office." (ECF No. 1-16, Ex. 15 to Junk Decl., Mot. to Correct Party's Name at 1, 4.) Defendants then removed the citation action to this court. In March 2016, the state court sanctioned Fineberg for violating Illinois Supreme Court Rule 137, concluding that she had moved for entry of conditional judgment without confirming whether she was proceeding against the proper party, despite the information the NFL

---

[6]On July 30, 2015, the state court dismissed the citation as to the Players Association.

and its counsel had provided. (ECF No. 23-2, Ex. 1 to Defs.' Mem. Supp. Mot., *Mitchell v. Mitchell*, No. 09 D 4119, Op. at 4-5 (Cir. Ct. Cook Cty. Mar. 22, 2016).)

*The Parties' Motions*

Plaintiff moves for entry of judgment against the Plans, arguing that the Plans violated the state court's orders by transferring to Qasim $124,379.15 ($64,379.15 by the Annuity Program and $60,000.00 by the Disability Plan) during the pendency of the citation proceedings. She also seeks attorneys' fees and costs. In plaintiff's view, the Plans were obligated to comply with the restraining provision of the citations until the citations were dismissed or otherwise disposed of by court order, and the "issue of whether the funds were subject to attachment should have been adjudicated by the court, not the NFL ERISA plans." (ECF No. 18, Pl.'s Am. Mot. Enter J. at 4, 7-8.)

Defendants move to dismiss the action or for summary judgment. They contend that the citations never properly named the Plans as respondents; even if they had named the Plans as respondents instead of the NFL and Players Association, the state court lacked personal jurisdiction over the Plans; and, in any event, plaintiff's claims are preempted by ERISA.

## DISCUSSION

**A.     Plaintiff's Motion**

Plaintiff's motion is brought pursuant to Federal Rule of Civil Procedure 69, which governs the enforcement of money judgments and provides that the "procedure on execution—and in proceedings supplementary to and in aid of judgment or execution—must accord with the procedure of the state where the court is located." Fed. R. Civ. P. 69(a)(1); *see also GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 626 (7th Cir. 2013). "Two provisions of Illinois law govern citation actions." *Id.* at 627. The first, 735 ILCS 5/2-1402(a), provides in pertinent part:

> A judgment creditor . . . is entitled to prosecute supplementary proceedings for the

8

> purposes of examining the judgment debtor . . . to discover assets or income of the debtor not exempt from the enforcement of the judgment, a deduction order or garnishment, and of compelling the application of non-exempt assets or income discovered toward the payment of the amount due under the judgment.

The second provision, Illinois Supreme Court Rule 277, states that supplementary proceedings shall be commenced by the service of a citation on the party against whom it is brought; requires the party to whom the citation is directed to appear for examination concerning the property of the judgment debtor; allows the party bringing the citation action to demand that the respondent produce records in its possession that may contain information concerning the debtor's property; and provides for discovery and a hearing on the citation.

Section 2-1402 states that the citation may prohibit the respondent from making or allowing any transfer of assets not exempt from the enforcement of a judgment, until further order of court or the termination of the proceeding, whichever occurs first. 735 ILCS 5/2-1402(f)(1). Furthermore, the court "may punish any party who violates the restraining provision of a citation as and for a contempt, or if the party is a third party may enter judgment against" it "in the amount of the unpaid portion of the judgment and costs allowable" under the statute, or in the amount of the value of the property transferred, whichever is lesser. *Id.* "The purpose underlying the restraining provision of § 2-1402 is to provide 'a means of forestalling the judgment debtor or a third party from frustrating the supplementary proceedings before the judgment creditor has had an opportunity to reach assets in the possession of the debtor or of a third party.'" *W. Bend Mut. Ins. Co. v. Belmont State Corp.*, No. 09 CV 354, 2010 WL 5419061, at *10 (N.D. Ill. Dec. 23, 2010) (ellipsis and brackets omitted) (quoting *Bank of Aspen v. Fox Cartage, Inc.*, 533 N.E.2d 1080, 1083 (Ill. 1989)), *aff'd*, 712 F.3d 1030 (7th Cir. 2013).

Plaintiff presents two arguments in her motion. The first is that this Court should find that

9

the Plans were obligated to comply with the restraining provision of the citations because plaintiff's having named the NFL and Players Associations as respondents was simply a "misnomer," or, alternatively, the Plans consented to the state court's exercise of personal jurisdiction over them by way of the Benefits Office's June 8, 2015 response to the interrogatories in the citations, production of responsive documents, and correspondence with the state court.

"A misnomer occurs where the plaintiff brings an action and serves summons upon the party intended to be made the defendant, thus giving actual notice of the lawsuit to the real party in interest, but the process and complaint do not refer to the person by his correct name. Mistaken identity, on the other hand, occurs when the wrong person is named and served. In other words, the misnomer provision applies only when the right defendant has been sued by the wrong name, not when the wrong defendant has been sued." *Arendt v. Vetta Sports, Inc.*, 99 F.3d 231, 234 (7th Cir. 1996) (emphasis, citations and internal quotation marks omitted) (citing Illinois decisions). The misnomer doctrine "prevents an opposing party from forcing the dismissal of a case due to a mistake in the name of the party." *Odle v. Dep't of State Police*, 43 N.E.3d 1223, 1229 (Ill. App. Ct. 2015). Because the doctrine is a "defense[] to the defense of statute of limitations," *Athmer v. C.E.I. Equip. Co.*, 121 F.3d 294, 295 (7th Cir. 1997) (applying Illinois law), it is inapplicable here. Plaintiff urges the Court to "find that the Citations naming the NFL and [Players Association] but being [sic] served upon the NFL ERISA Plans were mere misnomers," (ECF No. 19, Pl.'s Mem. Supp. Am. Mot. at 11), but fails to explain the upshot of such a finding or to cite any authority that supports her leap from this premise to the conclusion that the Plans were therefore subject to the citations after the citations were mailed to the Benefits Office.

As for personal jurisdiction, plaintiff's argument is the inverse of an argument defendants present in their motion. For purposes of both motions, the Court will assume, without deciding, that

10

the state court acquired personal jurisdiction over the Plans. The problem with plaintiff's motion, however, is that it stops there. Plaintiff merely states the conclusion that judgment should be entered against the Plans because they violated the restraining provision of the citations, with no analysis as to why the Plans were bound by the citations. As defendants point out in their response, plaintiff fails to discuss the interplay between ERISA and state-court citations to discover assets, despite having had notice (through defendants' notice of removal) that the Plans are asserting ERISA preemption. Plaintiff asserts that "ERISA did not exempt the Plans[] from complying with the citations," (*id.* at 14), but fails to develop the argument. Plaintiff's only developed preemption argument appears in her reply brief, and it is unpersuasive for the reasons discussed below.

Because plaintiff has failed to demonstrate that she is entitled to judgment against the Plans, her motion is denied.

**B.     Defendants' Motion**

As stated above, for purposes of judicial economy, the Court will bypass the personal-jurisdiction issue by assuming that the state court acquired personal jurisdiction over the Plans, and will proceed directly to the question of preemption. Subject to a few exceptions that are inapplicable here, ERISA "preempts all state laws that 'relate to any employee benefit[s] plan.'" *Teamsters Local Union No. 705 v. Burlington N. Santa Fe, LLC*, 741 F.3d 819, 825 (7th Cir. 2014) (quoting 29 U.S.C. § 1144(a)). The statute "seeks to make the benefits promised by an employer more secure by mandating certain oversight systems and other standard procedures," which are intended to be uniform. *Gobeille v. Liberty Mut. Ins. Co.*, --- U.S. ----, 136 S. Ct. 936, 943-44 (2016); *see also Metro. Life*, 481 U.S. at 64-65 ("[T]he policy choices reflected in the inclusion of certain remedies and the exclusion of others under the federal scheme would be completely undermined if ERISA-plan participants and beneficiaries were free to obtain remedies under state law that

Congress rejected in ERISA."); *Teamsters*, 741 F.3d at 825 ("The Supreme Court has held that Congress intended ERISA's comprehensive civil enforcement scheme to be exclusive."). "'[A]ny state-law cause of action that duplicates, supplements, or supplants the ERISA civil enforcement remedy conflicts with the clear congressional intent to make the ERISA remedy exclusive and is therefore pre-empted.'" *Teamsters*, 741 F.3d at 825-26 (quoting *Aetna Health Inc. v. Davila*, 542 U.S. 200, 209 (2004)); *see also Iowa Health Sys., Inc. v. Graham*, No. 07-CV-4030, 2009 WL 2222780, at *6 (C.D. Ill. July 23, 2009) ("ERISA carries the power to preempt not only state laws, but also the judgments and orders of state courts—even those orders touching on domestic relations, which is an area of law traditionally reserved for the state courts.").

The effect of ERISA preemption here is that plaintiff's citation action must be viewed as a claim by a potential beneficiary to recover benefits only as authorized by 29 U.S.C. § 1132(a). In other words, plaintiff's only remedy arises under ERISA, not the state-law citations to discover assets. *See Metro. Life*, 481 U.S. at 62-63; *Werner v. Grp. Health Plan, Inc.*, No. 09-CV-891-JPG, 2010 WL 1667853, at *2 (S.D. Ill. Apr. 20, 2010) ("If ERISA preempts a plaintiff's state-court claims, he is left only with claims arising under the Act . . . ."). "[T]he effect of a court finding that a claim has been preempted by ERISA results in the substitution of the applicable federal law in place of the preempted state law, which often results in dismissal of the cause of action." *Werner*, 2010 WL 1667853, at *2 (internal quotation marks, brackets and ellipsis omitted) (citing, *inter alia*, *Klassy v. Physicians Plus Ins. Co.*, 371 F.3d 952, 957 (7th Cir. 2004) (affirming district court's dismissal of plaintiff's ERISA-preempted action) and *Lister v. Stark*, 890 F.2d 941, 946 (7th Cir. 1989) (same)).

In response to defendants' preemption argument, plaintiff contends that "ERISA preemption does not apply to actions involving QDROs," and furthermore, that "[t]he Citations were themselves

12

QDROs, or were a mechanism to allow the court to enter a formal QDRO." (ECF No. 28, Pl.'s Combined Reply/Resp. at 3, 8.) Although ERISA generally requires all benefits to be distributed according to the terms of the benefit plan regardless of state law that may require other distributions, one exception to this rule is for QDROs that require payment to or for the benefit of a plan participant's family. *See Heisner v. Holland*, No. 02-CV-4150-JPG, 2002 WL 31226946, at *1 (S.D. Ill. Sept. 5, 2002); 29 U.S.C. § 1144(b)(7). To qualify as a QDRO under ERISA, the domestic relations order must meet strict requirements: it must create or recognize the existence of an alternate payee's right to, or assign to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant under a plan, and it must "clearly specify" the names and mailing addresses of the participant and each relevant alternate payee; "the amount or percentage of the participant's benefits to be paid by the plan to each such alternate payee, or the manner in which such amount or percentage is to be determined"; the number of payments or period to which such order applies; and each plan to which such order applies. 29 U.S.C. § 1056(d)(3)(B), (C).

The citations do not meet these requirements, so plaintiff's suggestion that the citations were "themselves QDROs" is wholly without merit. Moreover, plaintiff cites no authority that supports her contention that ERISA preemption applies expansively to "actions related to" QDROs.[7] And the Court agrees with defendants that "it strains credulity," (ECF No. 29, Defs.' Reply at 2), for

---

[7]The decisions plaintiff cites, *Metropolitan Life Insurance Co. v. Wheaton*, 42 F.3d 1080 (7th Cir. 1994), and *Unicare Life & Health Insurance Co. v. Phanor*, 472 F. Supp. 2d 8 (D. Mass. 2007), in which a domestic relations order was recognized as a QDRO even though it failed to meet every ERISA requirement, are distinguishable. In those cases, the order at issue was specific enough for the court to recognize it as a QDRO. But here, plaintiff's citations do not meet even the most basic requirement of "creat[ing] or recogniz[ing] the existence of an alternate payee's right" to receive benefits under a plan, let alone the remaining ERISA requirements. *See* 29 U.S.C. § 1056(d)(3)(B)(i).

plaintiff to argue that the citation proceedings constitute "QDRO proceedings" or were "related to" a QDRO. Plaintiff asserts that they were because she seeks benefits "pursuant to a domestic relations order for child support." (Pl.'s Combined Reply/Resp. at 5-6.) ERISA, however, "preempts any attempt to alienate or assign benefits by a domestic relations order if that order is not a QDRO," *Fox Valley & Vicinity Construction Workers Pension Fund v. Brown*, 879 F.2d 275, 279 (7th Cir. 1990) (en banc), *abrogated on other grounds by Kennedy v. Plan Adminstrator for DuPont Savings & Investment Plan*, 555 U.S. 285 (2009), and plaintiff's citations were not QDROs.[8]

Plaintiff also contends that the Plans "unreasonabl[y] insist[ed] that their internal procedures were the only valid procedures for processing a QDRO." (Pl.'s Combined Reply/Resp. at 1 (emphasis omitted).) But ERISA obliges plan administrators to act in accordance with the documents and instruments governing the plan insofar as those documents and instruments do not conflict with ERISA. *Kennedy*, 555 U.S. at 300; *Jackman Fin. Corp. v. Prudential Ins. Co. of Am.*, No. 09 CV 6430, 2010 WL 3800892, at *4 (N.D. Ill. Sept. 22, 2010). Although plaintiff calls defendants' procedures "rigid and narrow," (Pl.'s Combined Reply/Resp. at 5), she does not argue that they conflict with ERISA.

Accordingly, the Court dismisses this action as preempted by ERISA. The dismissal will be with prejudice because plaintiff does not suggest that she has any ERISA claims and does not seek leave to amend in the event that the Court grants defendants' motion, which seeks a with-prejudice dismissal.

The Court denies defendants' request for an award of attorneys' fees and costs pursuant to

---

[8]At the same time, plaintiff asserts that the citations "did not assign or alienate Plan benefits." (Pl.'s Combined Reply/Resp. at 8.) The Court agrees with defendants that this assertion undercuts plaintiff's contention that the citations themselves were QDROs. Furthermore, plaintiff is attempting to assign or alienate benefits by seeking enforcement of the citations.

14

28 U.S.C. § 1927. Requests for such relief should be brought by motion, not tagged onto the end of a brief without elaboration. *Robert Kulasik & Assocs., Inc. v. CBS Boring & Mach. Co.*, No. 90 CV 425, 1990 WL 65800, at *2 & n.4 (N.D. Ill. May 7, 1990).

## CONCLUSION

Plaintiff's amended motion to enter judgment against respondents in supplementary proceeding [18] is denied. Defendants' motion to dismiss and for summary judgment [26] is granted, and this action is dismissed with prejudice. Civil case terminated.

**SO ORDERED.**  **ENTERED:  June 5, 2017**

_____
**JORGE L. ALONSO**
**United States District Judge**